United States District Court
Southern District of Texas

**ENTERED**

April 17, 2024

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| NICHOLAS FUGEDI, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:19-cv-00249 |
| | § | |
| UNITED RENTALS (NORTH | § | |
| AMERICA) INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

There are a number of motions pending before me in this property dispute. *See* Dkts. 156, 158, 171, 189, 190, 203, 207, 256–57. I need only address: (1) Steadfast Parties'[1] Motion to Dismiss Fugedi's Claims and Defenses for Lack of Jurisdiction and Standing, and Fraud on the Court Under Inherent Powers ("Defendants' Motion to Dismiss") (Dkt. 158); and (2) the recent, and duplicative, Motions to Disqualify filed by Plaintiff Nicholas Fugedi ("Fugedi") as Trustee of

---

[1] Today the Steadfast Parties ("Defendants") are Steadfast Funding, LLC; Initram, Inc.; RJL Realty, LLC; Eternal Investments, LLC; Bruce Robinson; Dale Pilgeram as Trustee of the Pilgeram Family Trust; Joseph C. Hibbard; Kornelia Peasley-Brown; Salvador Ballesteros; Margaret M. Serrano-Foster, Trustee of the Margaret M. Serrano-Foster Trust Dated 12/02/2005; Richard R. Metler, Trustee of the Richard R. Metler Revocable Living Trust; James T. Smith, Trustee of the James T. Smith Trust; Liberty Trust Company, LTD Custodian FBO Vincent Paul Mazzeo Jr. IRA; Joe Saenz; Patrick Grosse, Trustee of the Grosse Family Trust Dated 12/31/2004; Eric Verhaeghe; Stephen K. Zupanc; Liberty Trust Company, LTD Custodian FBO Adam K Hruby IRA #TC005383; Vincent Investments, Inc., a/k/a Vincent Investments; Equity Trust Company Custodian FBO Stephen (Steven) Krieger IRA; Julio Schnars; Joseph Dersham; Joyce Dersham; Walter Kaffenberger; Christel Kaffenberger; Mike Berris (Berres); Jason Sun; Equity Trust Company Custodian FBO Erica Ross-Krieger IRA; ELM 401k PSP; and Laurel Mead and Edwin A. Mead as Trustees, ELM 401K PSP.

Fugedi also sued United Rentals (North America), Inc.; Contractors Access Equipment, Inc.; and Mustang Rental Services, LLC, but these three defendants were dismissed without prejudice on February 11, 2020. *See* Dkt. 58.

the Carb Pura Vida Trust ("the Trust").[2] *See* Dkts. 256–57. Because most of Fugedi's arguments for why I should disqualify myself are related to my jurisdictional analysis, I have addressed both motions in this opinion.

Earlier in this litigation, the Fifth Circuit vacated a summary judgment I issued. In remanding the case to me for further proceedings, one of the issues the Fifth Circuit directed me to examine on remand was Defendants' contention that "the [T]rust [is] a sham concocted by Texas individuals, thereby destroying diversity jurisdiction." *Fugedi as Tr. Carb Pura Vida Tr. v. Initram, Inc.*, No. 21-40365, 2022 WL 3716198, at *5 (5th Cir. Aug. 29, 2022) ("To the extent that diversity jurisdiction is in question, remand is the appropriate remedy when our jurisdiction remains unclear, but there is some reason to believe that jurisdiction exists." (quotations omitted)).

I have examined this issue and concluded—for reasons different and less fantastical than those advanced by Defendants—that the record shows the Trust and Fugedi's appointment as its Trustee were made to manufacture diversity jurisdiction where it would not otherwise exist in violation of 28 U.S.C. § 1359. I have also considered Fugedi's Motions to Disqualify, and find them wholly without merit. Accordingly, I **DENY** Fugedi's Motions to Disqualify (Dkts. 256–57); **GRANT** Defendants' Motion to Dismiss (Dkt. 158); and dismiss this matter without prejudice for lack of jurisdiction.

## BACKGROUND

On August 1, 2019, Fugedi[3] filed the instant lawsuit against 32 defendants to quiet title in property located at 829 Yale Street in Houston, Texas ("the Property"). *See* Dkt. 1 at 2–3. In the initial complaint, Fugedi asserted that "[t]his Court has

---

[2] The two disqualification motions were filed within a few hours of each other by different lawyers representing Fugedi. Attached to Dkt. 257—without reference or explanation—is a motion to recuse from an unrelated state court proceeding. The two motions are otherwise identical, so I will treat them as one motion.

[3] Unless otherwise stated, all references to Fugedi are to Fugedi in his capacity as Trustee of the Carb Pura Vida Trust.

[diversity] jurisdiction under 28 U.S.C. [§] 1332 as the claims are between citizens of different states." *Id.* at 7. For diversity purposes, Fugedi is a citizen of Michigan.[4] At the time this suit was initiated, Defendants were residents of 15 states: Arizona, California, Connecticut, Delaware, Florida, Idaho, Iowa, Nebraska, New Mexico, Ohio, South Carolina, Texas, Virginia, Washington, and Wisconsin. *See id.* at 3–6.[5] On the face of Fugedi's original complaint, this court has diversity jurisdiction because Fugedi is not a citizen of any state of which the 32 original Defendants were citizens. If Defendants are correct, however, that Fugedi is a "sham trustee," then I would be required to look beyond Fugedi's citizenship to the citizenship of the Trust's beneficiary. On the day this lawsuit was filed, the sole beneficiary of the Trust was Carb Pura Vida, LLC, whose sole member is Robert Elberger ("Elberger"). *See* Dkt. 247 at 3. Elberger is a citizen of Texas for diversity purposes. *See id.* So, if I find that Fugedi is a "sham trustee" or "straw fiduciary" and look beyond Fugedi's citizenship, then Elberger's Texas citizenship would destroy diversity jurisdiction.

Fugedi's initial complaint was filed by Texas attorney J. Marc Hill ("Mr. Hill"). Fugedi is now represented in this litigation by a number of other attorneys too, including Johnnie J. Patterson, II ("Mr. Patterson"). Fugedi is also advised by Texas attorney Lloyd Kelley ("Mr. Kelley") in administering the Trust, though not represented by Mr. Kelley in this litigation. *See* Dkt. 251 at 30.

On July 22, 2019—10 days before filing this suit—the Trust was created, Fugedi was appointed Trustee, and Fugedi purchased the Property from Bradley

---

[4] Federal Rule of Civil Procedure 17 provides, in relevant part, that "a trustee of an express trust" may sue in his own name "without joining the person for whose benefit the action is brought." FED. R. CIV. P. 17(a)(1)(E). Fugedi resides in Allen Park, Michigan. *See* Dkt. 251 at 9. Except for a one year spent in Hawaii, Fugedi has lived in Michigan his entire life. *See id.*

[5] Two of the three defendants dismissed on February 11, 2020 were the only residents of Delaware. Thus, Defendants today are residents of 14 states: Arizona, California, Connecticut, Florida, Idaho, Iowa, Nebraska, New Mexico, Ohio, South Carolina, Texas, Virginia, Washington, and Wisconsin.

Parker ("Parker"), the authorized agent of 2017 Yale Development, LLC ("2017 Yale"). *See* Dkt. 177-3; Dkt. 177-4 at 5–6. Fugedi purchased the Property for $275,000.00 cash, and executed an unsecured $2,500,000.00 note ("the Note") in favor of 2017 Yale. *See* Dkt. 177-4 at 6–7 ("We are aware that the $2,500,000.00 Note being executed today is an unsecured lien. No Deed of Trust will be filed of record to secure payment of same."). The $275,000.00 cash was supplied by Elberger via a July 19, 2019 cashier's check to the title company. *See* Dkt. 248-3. As part of this transaction, David Alvarez ("Alvarez")—the sole member of D&A Alvarez Group, LLC ("D&A Alvarez")—executed a Release of Lien against the Property. *See* Dkt. 177-4 at 28–30. Alvarez received $251,301.00 of the $275,000.00 that Elberger paid for the Property. *See id.* at 32; *see also* Dkt. 93 at 3 n.2. The remaining $23,699.00 went to closing costs. *See* Dkt. 177-4 at 32.

At the same time—in a related state court proceeding before Judge Beau Miller in the 190th Judicial District Court, Harris County, Texas (Cause No. 2016-64847)—2017 Yale, Alvarez, and D&A Alvarez were engaged in litigation with the Steadfast Parties. 2017 Yale and Alvarez were represented in Cause No. 2016-64847 by Mr. Kelley. *See* Dkt. 177-2 at 10, 12–13. In July 2019, Judge Miller "ruled as a matter of law that [2017] Yale and D&A Alvarez defaulted on their loans and thus breached the loan documents" between themselves and the Steadfast Parties. *2017 Yale Dev., LLC v. Steadfast Funding, LLC*, No. 01-20-00027-cv, 2023 WL 3184028, at *6 (Tex. App.—Houston [1st Dist.] May 2, 2023, pet. denied); *see also* Dkt. 16-7 (Final Judgment in Cause No. 2016-64847); Dkt. 161-20 (certified copy of Final Judgment in Cause No. 2016-64847).[6]

The day after Fugedi purchased the Property from 2017 Yale and Alvarez executed the Release of Lien against the Property, Judge Miller commenced a jury trial in Cause No. 2016-64847 on the Steadfast Parties' damages for 2017 Yale's

---

[6] The Texas Court of Appeals has summarized the history of the Property and the relationship between 2017 Yale, D&A Alvarez, and the Steadfast Parties leading up to said jury trial. *See 2017 Yale Dev., LLC*, 2023 WL 3184028, at *1–7.

and D&A Alvarez's breach of the loan documents and the Steadfast Parties' attorney's fees. *See* Dkt. 16-7 at 1 ("On the 23ʳᵈ day of July, 2019, this case came on for trial."). Ultimately, Judge Miller ordered that the Steadfast Parties "recover from [2017] Yale and D&A Alvarez a total of $8,355,104.89." *2017 Yale Dev., LLC*, 2023 WL 3184028, at *7; *see also* Dkt. 16-8 at 3; Dkt. 16-10 at 3. According to the Declaration of Net Worth filed by Parker following the judgment, 2017 Yale had no substantial assets other than the Property, which was transferred before the final judgment was issued. *See* Dkt. 16-8 at 2–7.

I take judicial notice of this background information—and of the Final Judgment in Cause No. 2016-64847—***not*** for the truth of the matters asserted or for any preclusive purpose, but solely to establish that these issues were being litigated in Texas state court at the time Fugedi purchased the Property from 2017 Yale and Alvarez executed the Release of Lien.

Defendants contend, among a great many other things, that the Trust was improperly or collusively created to invoke this court's diversity jurisdiction. *See* Dkt. 158 at 19. For the reasons discussed below, I agree and find that Fugedi is a straw fiduciary, and that Elberger's Texas citizenship controls for diversity purposes, meaning this court lacks jurisdiction to hear this case.

## MOTION TO DISMISS FOR LACK OF JURISDICTION

### A.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "Federal courts, both trial and appellate, have a continuing obligation to examine the basis for their jurisdiction. The issue may be raised by parties, or by the court *sua sponte*, at any time." *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990).

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made . . . to invoke the jurisdiction of such court." 28 U.S.C. § 1359. "The purpose of [§ 1359 is]

to prevent agreements whose primary aim [is] to vest the court with a jurisdiction it had not formerly enjoyed." *O'Brien v. AVCO Corp.*, 425 F.2d 1030, 1034 (2d Cir. 1969). "Accordingly, the legality of a relationship for state law purposes does not control its effect on federal jurisdiction." *Id.* Thus, "an assignment could be improperly or collusively made even though binding under state law." *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 829 (1969) (quotation omitted)).

"The question of whether a device is so lacking in substance as to be improper and collusive under Section 1359 is a question of fact." *Bass v. Tex. Power & Light Co.*, 432 F.2d 763, 766–67 (5th Cir. 1970). The Fifth Circuit has held that motive "is a determinative factor under § 1359." *Bianca v. Parke-Davis Pharm. Div. of Warner-Lambert Co.*, 723 F.2d 392, 395 (5th Cir. 1984).

> Factors to be considered by the district court in making a § 1359 inquiry include: [1] the relationship of the representative to the party represented; [2] the scope of the representative's powers and duties; [3] any special capacity or experience which the representative may possess with respect to the purpose of his appointment; [4] whether there exists a nondiverse individual who might more normally be expected to represent the interests at stake; [5] whether those seeking the appointment of the representative express any particular reasons for selecting an out-of-state person; and [6] whether, apart from the appointment of an out-of-state representative, the suit is one wholly local in nature.

*Id.* (quotation omitted). Other courts have considered:

> (1) whether and to what extent the assignee has a preexisting financial interest, (2) whether adequate consideration exchanged hands, (3) whether the underlying motivation of the assignment involved a sufficiently compelling business purpose that the assignment would have been made absent the purpose of gaining a federal forum, (4) whether the timing of the assignment supports an inference that the assignment was not entered into to create diversity, (5) whether the assignor has transferred all interest in the litigation, and (6) whether the assignee is financing the litigation.

*Reinhart Oil & Gas, Inc. v. Excel Directional Techs., LLC*, 463 F. Supp. 2d 1240, 1245 (D. Colo. 2006) (quotation omitted).

"When a party files a motion to dismiss alleging a factual attack that jurisdiction has been established in violation of Section 1359, the party seeking to invoke federal jurisdiction carries the burden to prove its existence by a preponderance of the evidence." *Gulf Fleet Tiger Acquisition, L.L.C. v. Thoma-Sea Ship Builders, L.L.C.*, 282 F.R.D. 146, 155 (E.D. La. 2012).

> [T]here is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. . . . It is elementary that a district court has broader power to decide its own right to hear the case than it has when the merits of the case are reached. Jurisdictional issues are for the court—not a jury—to decide, whether they hinge on legal or factual determinations. The unique power of district courts to make factual findings which are decisive of jurisdiction is, therefore, not disputed. This means that the district court is not limited to an inquiry into undisputed facts. It may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction. Thus, . . . [the Fifth Circuit has] upheld a dismissal for lack of subject matter jurisdiction which was based in part on the district court's determination—on the basis of a written record and the testimony of all parties—of factual issues that were in dispute.

*Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (cleaned up).

## B.   ANALYSIS

Before analyzing the facts of this case, I must address Fugedi's contention that "[t]here is no precedent for the application of 28 U.S.C.A. § 1359 to a trust and a trustee who purchases all of the interest in real property." Dkt. 254 at 2.

Fugedi makes much of Rule 17, arguing that "there is only one person that is the real party in interest that has standing to bring a claim in regard to a trust and that is the trustee." *Id.* at 3. Yet, Fugedi overlooks that executors, administrators, and guardians are also listed as real parties in interest under Rule 17. *See* FED. R. CIV. P. 17(a)(1)(A)–(C). Section 1359 was frequently applied against such

appointed fiduciaries prior to the 1988 amendment of 28 U.S.C. § 1332.[7] *See Bianca*, 723 F.2d at 394 ("We hold that an administratrix's citizenship will govern the diversity inquiry unless the administratrix was named with the motive of creating diversity where it would not otherwise exist."); *White v. Lee Marine Corp.*, 434 F.2d 1096, 1100 (5th Cir. 1970) ("Despite appellants' insistence that there were legitimate reasons for appointing Mr. Baggett [as guardian and administrator], Mrs. White and her family do not have sufficient substantive ties to Mr. Baggett or the state of Louisiana to support federal diversity jurisdiction. Allowing this suit to be brought in federal court would not advance any of the functions diversity jurisdiction was designed to serve."); *Bass*, 432 F.2d at 764 (finding estate's administrator was appointed solely to create diversity). Pre-1988 jurisprudence "presumably continues to be applicable to those appointments not covered by the express language of the amendment to Section 1332(c)(2)." 13F Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3640 (3d ed. 2023).

Fugedi offers no authority showing why § 1359 should not also be applied to a trustee's appointment, particularly when the plain language of the statute contemplates collusive devices "by assignment ***or otherwise***." 28 U.S.C. § 1359

---

[7] As noted in one treatise:

> In the past, one common method of 'manufacturing' diversity of citizenship jurisdiction was to appoint a representative, such as a guardian or an administrator, whose citizenship differed from that of the potential defendant, to prosecute the action. . . . The utility of that strategy has been reduced significantly, however, because in 1988, Congress eliminated the device of manufacturing diversity in certain contexts by appointing a representative from a jurisdiction other than that of the plaintiff's state citizenship.

13F Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3640 (3d ed. 2023). Section 1332 now provides that

> the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

28 U.S.C. § 1332(c)(2).

(emphasis added). Fugedi's best cases are inapplicable ones in which courts declined to apply § 1359 to an assignment that was made to *destroy* diversity, as opposed to *create* it. *See HDNet MMA 2008 LLC v. Zuffa, LLC*, No. 3:08-cv-0442, 2008 WL 958067, at *3 (N.D. Tex. Apr. 9, 2008) ("[T]here is no statute that expressly inhibits the use of devices to *defeat* federal jurisdiction."); *Amalgamated Gadget, L.P. v. MAck*, No. 3:03-cv-0952, 2004 WL 549483 (N.D. Tex. Feb. 10, 2004); *Ivanhoe Leasing Corp. v. Texaco, Inc.*, 791 F. Supp. 665, 667 (S.D. Tex. 1992) ("By statute, a party cannot *create* diversity by an assignment of claim. 28 U.S.C. § 1359. There is, however, no corollary statute that prohibits an assignment to destroy diversity.").

The Supreme Court has expressly contemplated that an "allegation of sham or collusion" warrants looking beyond the trustee's citizenship. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465 (1980) (in affirming judgment that trustees could invoke diversity jurisdiction on the basis of their own citizenship, the Supreme Court, citing § 1359, noted that, in the case before it, "[t]here is no allegation of sham or collusion"). Indeed, the Fifth Circuit—having determined that Fugedi holds a valid deed to the Property—remanded this case to me to examine that exact issue. *See Fugedi*, 2022 WL 3716198, at *5. Plenty of other courts have also contemplated the application of, or actually applied, § 1359 to a trust's creation or a trustee's appointment. *See Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900–01 (7th Cir. 2010) ("We treat an assignment as collusive when its sole function is to shift litigation from state to federal court. . . . Assignment to a trust could be designed to take advantage of the rule that a trust's citizenship is that of the trustee, rather than the beneficiaries, for the purpose of 28 U.S.C. § 1332(a)."); *McSparran v. Weist*, 402 F.2d 867, 874–75 (3d Cir. 1968) (discussing trustees alongside other types of fiduciaries and holding that "[w]hile [§ 1359] does not ban the appointment of nonresident fiduciaries, the artificial selection of a straw representative who has no duty or function except to offer the use of his citizenship to create diversity in contemplated litigation is a violation of its provisions");

*Owens, Tr. of Wells Irrevocable Tr. v. Wells*, No. 2:20-cv-00039, 2021 WL 836729, at *4 (E.D.N.C. Mar. 4, 2021) (contemplating application of § 1359 to a trust); *Minogue v. Modell*, No. 1:06-cv-286, 2006 WL 1704932, at *10 (N.D. Ohio June 16, 2006) (acknowledging that the "state of the law post-*Kramer*" is "that the collusive or improper joinder doctrine of *Kramer* applies to transfers to trustees and other representatives"); *Wells Fargo Bank Minn., N.A. v. El Comandante Cap. Corp.*, 332 F. Supp. 2d 448 (D.P.R. 2004) (examining the validity of a trustee's appointment under § 1359).

For example, the *Wells Fargo* court concluded that it had jurisdiction not because § 1359 was inapplicable, but because "notwithstanding the 'red flag' of temporal proximity between the removal of [the nondiverse] trustee, the appointment of [the diverse] trustee and the filing of the instant complaint," there were "ample *bona fide* business and practical considerations" for the appointment. *Id.* at 456. "Moreover, the uncontested evidence in the record [showed] that the creation of diversity of citizenship was neither a primary nor a substantial reason for the appointment of [the diverse] trustee." *Id.* It is true that "in cases where a claimant makes a bona fide, absolute transfer of its claims to a diverse citizen for the purpose of invoking federal jurisdiction," the "[Supreme] Court has held that federal jurisdiction is proper, and the motives of the transfer are irrelevant." *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1315 (11th Cir. 2007) (citing *Kramer*, 394 U.S. at 828 n.9). But two things distinguish that line of cases from the facts here.

First, there is evidence that the transfer from 2017 Yale to the Trust was not a *bona fide* transfer. "In evaluating the nature and validity of absolute transfers, the Supreme Court has . . . examined the consideration exchanged for the assigned claim." *Ambrosia Coal & Const. Co.*, 482 F.3d at 1315. The closing documents show that 2017 Yale did not receive any of the $275,000.00. That money went primarily, and directly, from the title company to Alvarez, with the remainder going to closing costs. *See* Dkt. 248-1 at 32; 248-4 at 1. Fugedi executed a $2,500,000.00 note in

favor of 2017 Yale as consideration for the Property, but the Note is unsecured and not a single payment has been made on it. *See* Dkt. 251 at 25. Thus, 2017 Yale has yet to receive anything beyond the lien release for the Property, which Fugedi values "[b]etween two and three million unfinished." Dkt. 246-1 at 242.

Second, and more importantly, but for Elberger's orchestrating the Trust's purchase of the Property—as opposed to Elberger's purchase of the Property himself, or through Carb Pura Vida, LLC—Elberger's Texas citizenship would have prevented this case from being brought in federal court. After all, Fugedi did not negotiate the purchase of the Property. *See* Dkt. 251 at 23. It was Elberger, a Texas citizen, who supplied the funds to purchase the Property before the Trust was even created. Elberger paid $275,000.00 to the title company via a cashier's check that was cut on July 19, 2019, three days before the Trust was created and before Fugedi was appointed Trustee. *See* Dkt. 248-3. Thus, what matters is not so much the *bona fides* of the purchase of the Property, but why the Trust was created and why Elberger arranged for the Trust to purchase the Property.

Under § 1359, it is appropriate for me to examine the motive behind the Trust's creation and Fugedi's appointment as Trustee to determine whether they are collusive devices to manufacture diversity jurisdiction where it would not otherwise exist. In doing so, I look to the six factors articulated in *Bianca*.

### 1.   *Fugedi's Relationship to Elberger*

Fugedi first met Elberger through Mr. Kelley, "a long-time family friend," at a dinner party in June 2019 that Fugedi believes was arranged by Mr. Kelley. Dkt. 251 at 14. When Fugedi and Elberger met again a few weeks later at Elberger's home, Mr. Kelley was there, too. *See* Dkt. 251 at 19. It was then that Elberger— having met Fugedi only once a few weeks before—presented the trusteeship to Fugedi as an "opportunity" *for Fugedi*. Dkt. 251 at 17. On July 22, 2019, less than two months after Elberger and Fugedi met, the Trust was executed and Fugedi became Trustee.

Fugedi contends that he "was asked to be the trustee after meeting Elberger and developing a relationship with him." Dkt. 254 at 6. Yet, much like the administrator in *Pistone v. Romano*, whose appointment was found collusive, Fugedi "was unknown" to Elberger prior to Mr. Kelley's introduction. 349 F. Supp. 293, 295 (E.D. Pa. 1972) (considering the administrator's lack of "special expertise in any matters that might be involved in this litigation" and the "wholly local" nature of the suit as factors that suggested manufactured diversity jurisdiction). Elberger asked Fugedi to become the Trustee having met Fugedi only twice in as many months, and with Mr. Kelley present at both meetings.

Mr. Kelley is a lawyer for the Trust. *See id.* at 30. Mr. Kelley was 2017 Yale's and Alvarez's attorney in Cause No. 2016-64847. *See* Dkt. 177-2 at 10, 12–13. Mr. Kelley represented 2017 Yale *and* Alvarez at the time the Trust purchased the Property and Alvarez executed the Release of Lien. The Trust purchased the Property from 2017 Yale on the eve of the jury trial in Cause No. 2016-64847, to which 2017 Yale and Alvarez were parties. Judge Miller had already determined as a matter of law that 2017 Yale and Alvarez were liable to the Steadfast Defendants— the only question was the extent of their liability. The Property was 2017 Yale's only substantial asset. *See* Dkt. 16-8 at 2–7. That Mr. Kelley represented 2017 Yale and Alvarez at the same time he introduced Fugedi to Elberger; that Elberger arranged for the purchase of the Property from 2017 Yale following the judgment against it and on the eve of the trial to determine 2017 Yale's liability; and that Elberger then appointed Fugedi as Trustee suggest that Fugedi is simply a strawman.

### 2. *The Scope of Fugedi's Power and Duties*

The Trust Agreement facially grants Fugedi a wide range of powers. *See* Dkt. 177-3 at 4–7. Yet, the evidence suggests that Fugedi simply does what his attorneys tell him to do. For example, Fugedi testified that he believes Mr. Kelley "pay[s] some of the lawyers [for the Trust] out of his pocket." Dkt. 251 at 31. Mr. Patterson objected that Fugedi's testimony as to how the Trust's lawyers are paid assumes facts not in evidence. That is a valid objection, but how the Trust's lawyers are paid

is not relevant. What is relevant is the fact that Fugedi *believes* Mr. Kelley pays some of the Trust's other attorneys himself, and that Fugedi seemed otherwise ignorant as to how some attorneys are paid. Fugedi's own subjective belief regarding Mr. Kelley's involvement in the Trust is relevant to the question of who really controls the Trust. This testimony suggests that it is not Fugedi.

Fugedi also does not know why no payment has been made on the Note, testifying: "My understanding is that we were not going to pay on the [N]ote because it was – the case was still tied up in litigation." *Id.* at 25. Yet, Fugedi could not tell me *why* litigation excused the Trust from paying on the $2,500,000.00 note that it executed in favor of 2017 Yale, in what should have been an arm's length transaction. Fugedi believes the $2,500,000.00 note that he executed on the Trust's behalf in favor of 2017 Yale is a secured note. *See id.* at 24. It is not. *See* Dkt. 177-4 at 6–7 ("We are aware that the $2,500,000.00 Note being executed today is an unsecured lien. No Deed of Trust will be filed of record to secure payment of same.").[8] Fugedi's testimony suggests that the Trust's lawyers do far more than simply advise Fugedi on how to manage the Trust. Fugedi's testimony suggests that the Trust's lawyers are in fact the ones managing the Trust, and that he blindly acquiesces to their direction. To the extent Fugedi testified otherwise, I find that testimony "incredible." *See Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1207 (10th Cir. 2014) (finding that district court's credibility determination regarding the motive for the plaintiff's assignment was not clearly erroneous because there was "ample support in the record for that finding").

---

[8] In a letter filed 15 days after the hearing and 6 days after Fugedi's post-hearing briefing, Fugedi's counsel makes two asides regarding vendor's liens that were not raised during the hearing or in Fugedi's post-hearing briefing. *See* Dkt. 258 at 6 ("Judge Edison doesn't know what a vendor's lien is and how it applies to a money-purchase note."); *id.* at 9 ("Judge Edison referenced the 'lack of security' without even considering security by way of a vendor's lien."). These arguments miss the mark. Whether the note is secured or unsecured is not nearly as important as the fact that *no money has been paid on the Note in nearly five years* and *Fugedi does not know why*.

It bears repeating that Mr. Kelley is not just the Trust's lawyer. At the time Fugedi purchased the Property from 2017 Yale, and at the time this litigation was instituted, Mr. Kelley was also representing 2017 Yale *and* Alvarez. *See* Dkt. 177-2 at 10, 12–13. But Mr. Kelley is not the only Trust lawyer who represents or has represented a party with an interest in the Property. Mr. Hill represented Brad Parker in *Steadfast Funding, LLC. v. Jetall Cos.*, Cause No. 2019-23950 (190th Jud. Dist. Ct.). *See* Dkt. 16 at 9. Recall that Parker was the authorized agent of 2017 Yale from whom Fugedi purchased the Property. Mr. Kelley recommended Mr. Hill to Fugedi. *See* Dkt. 251 at 30–31. Thus, I also find incredible Fugedi's testimony that, to the best of his knowledge, there was no threatened litigation regarding the Property when it was purchased. *See* Dkt. 251 at 52. This seems improbable—if not impossible—given that not one, but two, of the Trust's lawyers were representing or had represented other parties with interests in the Property in litigation concerning the Property in proceedings in Texas state court. These facts suggest collusion to manufacture diversity jurisdiction where it would not otherwise exist.

### 3.   *Fugedi Has No Special Experience*

Fugedi's college degree program included a major in art education and a minor in painting. *See* Dkt. 251 at 10. He has been teaching art ever since he graduated college. *See id.* at 10–11. He had never served as a trustee before becoming the Trustee of the Carb Pura Vida Trust. *See id.* at 11. He has never developed real estate and has never had any business dealings in Texas. *See id.* By his own admission, he had no experience that made him particularly qualified to serve as the Trustee. *See id.* at 19. This factor clearly suggests manufactured jurisdiction. *See Renner v. Vitcov*, 339 F. Supp. 1020, 1022 (E.D. Pa. 1972) (finding manufactured diversity jurisdiction where "the administrator, as a salesman, admitted that he has never been an executor or administrator before, he has never been a party to a personal injury suit, he has had no experience in personal injury litigation, and he has little knowledge of legal proceedings").

### 4.    *A Nondiverse Individual Would More Normally Be Expected to Represent the Interests at Stake*

Fugedi argues he "cannot speculate as to whether there is a nondiverse individual that might more normally be expected to represent the interests at stake." Dkt. 254 at 7. He merely notes that "[n]o other potential 'nondiverse individuals' were identified." *Id.* But no one else had a burden to identify a nondiverse individual. The timing of the Property's purchase alone is enough to raise a factual attack on Fugedi's appointment. Fugedi, "as the party seeking to invoke jurisdiction, has the burden of proving the facts necessary to sustain jurisdiction." *Harvey Const. Co. v. Robertson-CECO Corp.*, 10 F.3d 300, 303 (5th Cir. 1994). At a minimum, one would expect a trustee whose sole duty is to manage the development of a multi-million-dollar real estate project in Houston, Texas to be closer than 1,300 miles away to the property being developed, and have at least some experience in developing real estate. Thus, this factor weighs in favor of finding collusive diversity jurisdiction.

### 5.    *The Particular Reasons for Selecting an Out-of-State Trustee*

Fugedi's counsel are of the firm conviction that the motivation behind his appointment is not relevant. *See* Dkt. 254 at 3 n.4; Dkt. 256 at 11; Dkt. 259 at 12. As discussed above, it very much is relevant, and Fugedi has the "burden of proving the facts necessary to sustain jurisdiction." *Harvey Const. Co.*, 10 F.3d at 303.

Mr. Hill takes issue with my asking Fugedi *why* Elberger selected Fugedi as Trustee, arguing that Fugedi would only be speculating. That is a fair point, but it, too, misses the mark. In the face of his burden—and the timing of the Property's purchase and his own lack of experience as a Trustee or developing real estate— the best Fugedi can come up with is speculation "that the Trust and the property were seen as an opportunity for Fugedi *to learn* more about real estate ownership and development." Dkt. 254 at 6 (emphasis added). However true or altruistic that may be, it is not normal to select a trustee—a fiduciary—*for the trustee's benefit. See* FIDUCIARY, BLACK'S LAW DICTIONARY (9th ed. 2009) ("A person who is required

to act for the benefit of another person on all matters within the scope of their relationship."). While there is certainly no law *forbidding* a settlor from selecting a trustee for the trustee's own edification, there is also no law requiring me to credit "the trustee's edification" as a reason that weighs against finding manufactured diversity jurisdiction. Thus, this factor also weighs in favor of finding collusive diversity jurisdiction.

### 6.    *This Suit Is One Wholly Local in Nature*

This suit concerns a piece of Texas real estate that, until Fugedi purchased it, was owned by Texas citizens who were represented by Texas lawyers in Texas state court proceedings. Elberger—the individual who (presumably) negotiated the purchase of the Property,[9] who supplied the funds for the purchase, who created the Trust, who directed Fugedi to purchase the Property, and for whose benefit the Property is held—is *also* a Texas citizen. The only thing that is *not* local about this controversy is the fact that 24 of the 32 Defendants in this case are citizens of states other than Texas (or Michigan). Yet, all 32 Defendants were happily litigating in state court, in multiple proceedings. *See* Dkt. 16-3; Dkt. 16-5; Dkt. 16-6. Indeed, "every claim brought in this case could have been litigated in front of the state court. Texas state courts are courts of general jurisdiction." *Wilson v. First Cmty. Credit Untion*, No. 4:15-cv-3178, 2017 WL 6939088, at *4 (S.D. Tex. Mar. 29, 2017).[10] Thus, other than the diversity jurisdiction that has been manufactured here, this is a quintessentially local suit.

---

[9] There is no evidence in the record establishing that Elberger—as opposed to Kelley or someone else—negotiated the purchase of the Property. The important point is that it was *not* Fugedi. *See* Dkt. 251 at 23.

[10] It is absurd for Fugedi to suggest that application of 28 U.S.C. § 1359 would leave him in a "wilderness of mirrors in which neither Petitioner nor its beneficiaries can access a court to clear title to its property." Dkt. 256 at 11. Texas state court judges, including the previously mentioned Judge Beau Miller, are more than capable of handling in Texas state court a Texas state law claim to quiet title to a Texas property.

### 7.   Other Factors

Further analysis is not necessary, as all six of the *Bianca* factors weigh in favor of finding that diversity jurisdiction was collusively manufactured. Yet, because additional factors that other courts have considered *also* weigh in favor of finding collusive diversity jurisdiction, I will briefly discuss them. *See Reinhart Oil & Gas, Inc.*, 463 F. Supp. 2d at 1245.

In some courts, a "beneficial interest in the outcome of the litigation" will "ke[ep] the appointment from being a sham transaction condemned by § 1359." *Martinez v. U.S. Olympic Comm.*, 802 F.2d 1275, 1279 (10th Cir. 1986). Fugedi has no beneficial interest here. He was paid $5,000 up front, and—despite the trust agreement clearly providing for reasonable compensation—he has not been paid anything beyond that initial $5,000, and does not know what other compensation he will ultimately receive. *See* Dkt. 251 at 28–29, 54–55. While this factor does not compel a finding that Fugedi's appointment is in violation of § 1359, it "requires inquiry into the motive for the appointment." *Martinez*, 802 F.2d at 1279.

As discussed above, the consideration exchanged for the Property was questionable. Because the Trust has paid nothing on the Note, 2017 Yale has thus far received nothing more than the release of a lien for a property valued at two-to three-million dollars.

The underlying motivation for appointing Fugedi was not a compelling business reason. Fugedi's own contention is that he was appointed Trustee because it was an opportunity for him—the fiduciary—"to learn more about real estate ownership and development." Dkt. 254 at 6. This is *a* reason, but it is not a compelling business reason.

The timing of the Property's transfer from 2017 Yale to the Trust—in the same month that Judge Miller ruled that 2017 Yale owed the Steadfast Parties $8,355,104.89—supports an inference that the Trust was created so that 2017 Yale could offload the only substantial asset it had to satisfy the judgment against it,

and Fugedi was appointed Trustee to create diversity jurisdiction and avoid litigating title to the Property in Texas state courts.

As to the fifth and sixth factors—whether the assignor has transferred all interests and whether the assignee is financing the litigation—the Property is owned by an irrevocable trust. That would ordinarily be a factor that weighs against finding collusion. But Fugedi's actions appear to be undertaken at the direction of his Texas attorneys and Elberger—after all, Fugedi does not know why the Trust has not made a payment on a $2,500,000.00 note in nearly five years. Moreover, Fugedi believes that at least some of the Trust's attorneys are being paid by Mr. Kelley. Whether some of the Trust's attorneys are actually being paid by Mr. Kelley is irrelevant. The fact that Fugedi does not know how some attorneys are being paid, and that he believes Mr. Kelley is the one paying them, suggest that Fugedi is not the one in control.

* * *

For all these reasons I find that the Trust and Fugedi's appointment as Trustee were collusively made to create diversity jurisdiction in violation of § 1359. Thus, I will grant Defendants' Motion to Dismiss (Dkt. 158) for lack of jurisdiction and dismiss this matter without prejudice. *See Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) (dismissal for lack of jurisdiction "is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction").

## DEFENDANTS' REQUEST FOR SANCTIONS

Having granted Defendants' Motion to Dismiss, I must address Defendants' request that I dismiss Fugedi's claims with prejudice and award attorney's fees to Defendants. The Supreme Court has "recognized three exceptions to the 'American Rule' against shifting fees to the losing party." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994). The relevant exception here is "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive

reasons.'" *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)).[11] The basis for Defendants' request is their argument that Fugedi has perpetrated a fraud upon the court. *See* Dkt. 158 at 6. Fraud on the court falls within the bad faith exception. *See Chambers*, 501 U.S. at 46. "Fraud" is the "knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." FRAUD, BLACK'S LAW DICTIONARY (9th ed. 2009).

Fugedi is dead wrong that § 1359 does not apply here and that the motive behind his appointment is irrelevant. But that does not mean his arguments to the contrary were fraudulent or of the type that would warrant sanctions. Every piece of evidence I have cited in this opinion has either been introduced by Fugedi, testified to by Fugedi, or referenced by Fugedi. That is not fraud.

Section 1359 exists because Congress expects that parties will attempt to manipulate jurisdiction.[12] If manufacturing jurisdiction were an exception to the American Rule, one would expect to see a penalty laid out in § 1359. But in all the cases I have read in which courts have found manufactured jurisdiction, not one has awarded or even contemplated sanctions, much less dismissal with prejudice. Remember, dismissal for lack of jurisdiction "is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Ramming*, 281 F.3d at 161. Having determined that this court lacks jurisdiction, I will not take the extraordinary measure of imposing sanctions. *See Chambers*, 501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").

---

[11] The first exception is the "common fund exception," where the litigation benefits others. The second exception is for willful disobedience of a court order. *See Amsted*, 23 F.3d at 378. Neither exception applies here.

[12] Indeed, Congress has anticipated the manipulation of jurisdiction since at least 1875, when it enacted the predecessor statute to § 1359. *See Farmington Vill. Corp. v. Pillsbury*, 114 U.S. 138, 142 (1885).

## MOTION FOR RECUSAL

**A.    LEGAL STANDARD**

Fugedi asks me to disqualify myself "pursuant to 28 U.S.C. § 455(a)." Dkt. 256 at 5. That subsection directs a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). As the Fifth Circuit has explained:

> Under § 455(a), "what matters is not the reality of bias or prejudice but its appearance," *Liteky v. United States*, 510 U.S. 540, 548 (1994), because "justice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. 133, 136 (1955). In applying the statute, a court considers "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995). The objective standard relies on the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003) (quoting *Jordan*, 49 F.3d at 156). Justice Kennedy, concurring in *Liteky*, wrote that "§ 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings," such that recusal was required "if it appears that [the judge] harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." *Liteky*, 510 U.S. at 557–58 (Kennedy, J., concurring).

*United States v. Brocato*, 4 F.4th 296, 301–02 (5th Cir. 2021) (cleaned up).

"Not all unfavorable disposition towards an individual (or his case) is properly described by ['bias or prejudice']." *Liteky*, 510 U.S. at 550.

> The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote guilty regardless of the facts).

*Id.* With these basic considerations in mind, I turn to Fugedi's arguments for why I should disqualify myself from this matter.

## B.   ANALYSIS

Fugedi's reasons for why I should disqualify myself appear to be (1) his belief that I or my staff "have engaged in an extensive independent investigation that has been *ex parte*"; (2) his claim that I expected him "to brief issues on an unknown record"; (3) his contention that § 1359 does not apply to trusts and trustees who purchase real property; (4) my delay in ruling on the pending motions in this matter; (5) his belief that I have listened to "tapes and/or read the fake 'transcripts' Mr. [Christopher] Ramey created"; and (6) my request for a certified copy of Fugedi's deposition that was referenced in Defendants' motions. Dkt. 256 at 3, 7, 12. I will begin by addressing my delay in ruling on the pending motions.

### 1.   *Delay in Ruling*

I have, admittedly, taken too long to rule on the pending motions in this matter. The dispositive motions I directed the parties to file following the Fifth Circuit's mandate were ripe for ruling in December 2022. I did not set a hearing until October 2023. This delay was unacceptable. It was not, however, indicative of bias or prejudice. *See Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (D.C. Cir. 1995) (bias could not be inferred from "court delays in ruling on pending motions"); *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) ("Neither the district judge's [two-year] delay [in ruling], nor his adverse rulings, constitute the sort of 'pervasive bias' that necessitates recusal."); *West v. United States*, 994 F.2d 510, 512 (8th Cir. 1993) ("While the delays in ruling . . . were unfortunate, they do not evidence bias."). Nor does Fugedi offer any support for the notion that a court's general neglect of a case or delay in ruling—something that affects all parties—could evidence bias or prejudice. Although Fugedi has raised the issue of delay more than Defendants, Fugedi's numerous filings do not create bias or prejudice on my part.

In a letter supplement to his Motion to Disqualify, Fugedi attributes the delay to me and my staff spending "the last 18-months conducting an 'independent investigation' looking at selective internet gossip." Dkt. 258 at 11. Yet, Fugedi fails to identify whatever "internet gossip" he believes I or my staff have seen, or how my remarks indicate that I have seen it. Conclusory assertions have no more place in a motion to disqualify than any other motion. *See United States v. Alexander*, 726 F. App'x 262, 263 (5th Cir. 2018) (affirming district judge's refusal to recuse himself where, "[a]side from conclusory assertions that the judge was prejudiced, [the defendant] did not offer facts suggesting the judge's impartiality might reasonably be questioned or that the judge had an actual personal extrajudicial bias against him").

### 2.    *My Analysis of this Court's Jurisdiction Under § 1359*

The rest of Fugedi's contentions all relate to my jurisdictional analysis, so I will address them together.

As discussed above, § 1359 applies to the appointment of a trustee. Fugedi cites no authority for the proposition that a judge's contrary interpretation of law evinces bias or prejudice. "'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). This is especially true where jurisdiction is concerned. "Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may undertake an independent investigation to assure itself of its own subject matter jurisdiction, and consider facts developed in the record beyond the complaint." *CFA Inst. v. Andre*, 74 F. Supp. 3d 462, 465 (D.D.C. 2014) (cleaned up).

As for Fugedi's suggestion that I have conducted a "secret trial," I told the parties on the record during the March 27, 2024 hearing:

[Defendants' counsel], Mr. Ramey has raised in his motion to dismiss [Dkt. 158] that . . . the Carb Pura Vida Irrevocable Trust was collusively created under 28 U.S.C. [§] 1359.

And as I'm sure you are all aware, that statute provides that, "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

And in looking at that statute, the Fifth Circuit has held that, "An administratrix's citizenship will govern the diversity inquiry unless the administratrix was named with the motive of creating diversity where it would not otherwise exist." And that's the case *Bianca v. Parke-Davis Pharmaceutical Division of Warner-Lambert Company*, 723 F.2d [392, 394 (5th Cir. 1984)].

And that same test would apply here where defendants have raised a factual attack on the creation of the [T]rust and then the naming of Mr. Fugedi as trustee.

And the relevant considerations the Fifth Circuit has identified are, and I quote, "The relationship of the representative to the party represented; the scope of the representative's powers and duties; any special capacity or experience which the representative may possess with respect to the purpose of his appointment; whether there exists a nondiverse individual who might be more normally expected to represent the interest at stake; whether those seeking the appointment of the representative express any particular reasons for selecting an out-of-state person; and whether, apart from the appointment of an out-of-state representative, the suit is one wholly local in nature."

I have obviously spent a great deal of time reviewing the record, including the . . . eight exhibits that Mr. Fugedi's counsel submitted last night. And initially it seems to me that this trust was created and Mr. Fugedi was selected as its trustee solely to create diversity jurisdiction where it would not otherwise exist.

And I say that because Mr. Fugedi's strongest tie here is to Lloyd Kelley, a long-time family friend and Texas lawyer, who I note for the record represented both David Alvarez and 829 Yale in Case 2016-64847, which was in the 190th Judicial District of Harris County; that Mr. Fugedi has never been a trustee before; never done business in Texas before; never managed any real estate before.

From the testimony I just heard, he didn't know that the note he executed in favor of the [T]rust is unsecured according to the

> various . . . documents that were submitted last night. Mr. Fugedi did not know what it means for a note to be secured or unsecured.
>
> And more importantly -- most importantly, if I disregard Mr. Fugedi's citizenship, I'm left with the LLC whose sole member when this lawsuit was filed was Elberger, who we have established is a Texas citizen.
>
> This is, obviously, a dispute about Texas property. All the Texas lawyers who helped Mr. Fugedi with the administration of the [T]rust today represented previous owners, Texas citizens, o[f] this Texas property in litigation in Texas State court.
>
> So that is sort of what I'm thinking, just to lay it all out on the line; but obviously, my mind remains open. And I want to hear any argument, any evidence the parties want to present.

Dkt. 251 at 44–47.

During the March 27, 2024 hearing, Fugedi's counsel asked me what evidence I had reviewed in analyzing Defendants' motion to dismiss for lack of subject matter jurisdiction. I told the parties that "I have read every single document in the court file that's been submitted." *Id.* at 77–78. The court's record is always the record itself on a motion to dismiss for lack of jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) ("A 'factual attack,' . . . challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."). That does not mean, however, that I considered everything I read in making my decision.

Fugedi's counsel rightly pointed out that the court's file "includes documents that have been attached by Mr. Ramey that have never been introduced into evidence and they are not admissible." Dkt. 251 at 78. I responded: "[I]f things are struck or things aren't authenticated[, then they would] not [be] considered." *Id.* And I did not consider such things. For example, I have not addressed Fugedi's objections[13] to "tapes or transcripts of tapes or excerpts of tapes by Chris Wyatt

---

[13] Fugedi had already lodged his objections to the evidence submitted by Defendants in connection with their motion to dismiss. *See* Dkt. 176.

24

(the 'Wyatt Exhibits')," Dkt. 176 at 1, because I have not relied on the Wyatt Exhibits.[14] *See Gonzales v. AutoZoners, LLC*, 860 F. Supp. 2d 333, 337 (S.D. Tex. 2012) ("Many objections raised by Plaintiff's counsel are immaterial because they pertain to statements or evidence upon which the Court does not rely for any rulings.").

In setting the March 2024 hearing, I told the parties flat out: "After reviewing the motion to dismiss briefing and the attachments to that briefing— ***without even considering the hotly disputed recordings***—I am not satisfied that diversity jurisdiction exists." Dkt. 240 at 2 (emphasis added). I "referenced the tapes which Mr. Ramey provided to the Court," Dkt. 256 at 11, solely to state that they were *irrelevant* to my jurisdictional analysis. To wit, we did not discuss these tapes at the hearing. Thus, I struggle to understand how it could seem "clear" to anyone that I had "listened to those tapes." *Id.* at 12.[15]

I told the parties everything of which I was taking judicial notice. I told the parties that I looked at the appellate opinion in *2017 Yale Development, LLC v. Steadfast Funding, LLC*. *See* Dkt. 251 at 79. I mistakenly identified it as an opinion from the 14th Court of Appeals—as opposed to the 1st Court of Appeals—but that is irrelevant because no one raised any objections then or in post-hearing briefing regarding my reading any appellate opinion. I told the parties that I took "judicial

---

[14] According to Defendants, these tapes demonstrate "that attorney Lloyd Kelley and . . . Ali Choudhri secretly owned both 2017 Yale and the . . . Carb Pura Vida Trust, and bribed both Brad Parker and Nicholas Fugedi to pretend to be real parties to handle both sides of their fake transaction." Dkt. 158 at 3.

[15] Mr. Ramey's "transcripts" of the tapes are embedded in his briefing, so it was impossible to not read them. (And yet, it was simultaneously impossible to read them due to Mr. Ramey's use of bright, red font and incomprehensible formatting.) I did not, however, consider any of the assertions contained therein in determining the jurisdictional issues in this case. *See Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("[J]udges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." (quotation omitted)); *United States v. Cardenas*, 9 F.3d 1139, 1154 (5th Cir. 1993) ("[A] trial judge is presumed to rest his verdict on admissible evidence and to disregard the inadmissible." (quotation omitted)). The only evidence I have relied on in writing this opinion is that which is cited as support in this opinion.

notice with the various representation of lawyers involved in this case and the State court proceeding." *Id.* Again, no one raised any objections then or in post-hearing briefing regarding my taking judicial notice of their representation of other parties in the State court proceeding.

Prior to the March 2024 hearing, I requested a certified copy of the deposition transcript referenced in Defendants' August 25, 2023 letter to the court. *See* Dkt. 245. That transcript is from a June 1, 2023 deposition Fugedi gave in *829 Yale Holdings, Inc. v. 2017 Yale Development, LLC*, No. 4:22-cv-905 (S.D. Tex.). Mr. Patterson argued that, as "a deposition from a prior unrelated case," it was inappropriate for me to consider the transcript under Rule 32. Dkt. 251 at 59. I disagreed and overruled the objection. "An adverse party may use for any purpose the deposition of a party." FED. R. CIV. P. 32(a)(3). Defendants are adverse to Fugedi, and Defendants put the transcript in the record. Moreover, the statements of a party-opponent are never hearsay. *See* FED. R. EVID. 801(d)(2)(A).

Prior to the hearing, I ordered Fugedi to identify the citizenship of the member(s) of Carb Pura Vida LLC as of August 1, 2019, the date this case was filed. *See* Dkt. 244 at 1; *see also Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). I did this because, had the Trust's beneficiary *also* been diverse, it would have seemed much less likely that Fugedi "was named [Trustee] with the motive of creating diversity where it would not otherwise exist." *Bianca*, 723 F.2d at 394. There is no bias or prejudice in my requesting on-the-record information relevant to the court's diversity jurisdiction that would have made the jurisdictional analysis more efficient.

Three days after Fugedi filed his duplicative motions to disqualify, Mr. Hill filed a 12-page supplemental letter. *See* Dkt. 258. Five days later, Mr. Hill filed a *second* supplemental letter—this one is 13 pages long. *See* Dkt. 259. I would be well within my discretion to disregard these letters, which were filed without leave of court and do not raise any arguments that could not have been raised by the initial

motions to disqualify. But I will address the arguments made in these letters anyway.

To start, Mr. Hill complains that I have not fact-checked Mr. Ramey's statements regarding cases filed after this lawsuit. *See id.* at 1–3. But I have not considered these arguments because statements Mr. Ramey made *after* this lawsuit was filed have no effect on the jurisdictional analysis.[16] "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."[17] *Newman-Green, Inc.*, 490 U.S. at 830. Moreover, "a party may neither consent to nor waive federal subject matter jurisdiction." *Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Thus, nothing Mr. Ramey said *before* the filing of this lawsuit has any bearing either. My § 1359 jurisdictional analysis is focused solely on the motive behind the Trust's creation and Fugedi's appointment as Trustee. *See Bianca*, 723 F.2d at 395.

Mr. Hill also complains that I have "morphed" or "re-framed" Mr. Ramey's jurisdictional arguments. *See* Dkt. 258 at 3. It is true that my reasons for finding that jurisdiction was manufactured in violation of § 1359 are different from the reasons Mr. Ramey advanced. But I am not beholden to Mr. Ramey's arguments. I

[16] In any event, *Mr. Ramey's* invocation of diversity jurisdiction when naming Fugedi (as Trustee) as a party in *other* federal court lawsuits is not per se improper. As I have stated before—and as Fugedi's counsel are keen to point out—Fugedi is a valid trustee. *See* Dkt. 240 at 1. Fugedi holds a valid deed to the Property. *See Fugedi*, 2022 WL 3716198, at *3. But that is *irrelevant* under § 1359. *See Kramer*, 394 U.S. at 829 ("[A]n assignment could be improperly or collusively made even though binding under state law." (quotation omitted)); *O'Brien*, 425 F.2d at 1034 ("Accordingly, the legality of a relationship for state law purposes does not control its effect on federal jurisdiction."). Again, all that matters is motive, and it is Fugedi's burden to prove facts establishing jurisdiction. *See Williamson*, 645 F.2d at 413. He has not carried that burden. That does not mean the deed to the Property is invalid. It simply means federal courts will not permit Fugedi to invoke diversity jurisdiction when that is the only reason the Trust was created, Fugedi was appointed its Trustee, and the Property titled in his name.

[17] That the relevant point in time for determining jurisdiction is the date the complaint was filed does not preclude me from considering post-filing testimony to aid in resolving disputed facts concerning the motive behind creating the Trust and appointing Fugedi as Trustee. *See Williamson*, 645 F.2d at 414 ("[A] judge may be required to hear oral testimony where the facts are complicated and testimony would be helpful.").

have "a continuing obligation to assure [my]self of [this court's] jurisdiction, sua sponte if necessary." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 468 (5th Cir. 2020) (quotation omitted). Moreover, "'[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *U.S. Nat'l Bank of Or.*, 508 U.S. at 446 (quoting *Kamen*, 500 U.S. at 99).

Defendants raised the issue of collusive diversity jurisdiction on October 21, 2022. *See* Dkt. 158 at 19 (citing § 1359).[18] The parties had a full and fair opportunity to brief that motion, which has been ripe for ruling for well over a year. During the March 27, 2024 hearing, I told the parties exactly what law and which facts seemed relevant to me. *See* Dkt. 251 at 44–47. At no point did Fugedi's counsel ask to call other witnesses or to continue the hearing so that other evidence could be presented. Moreover, the parties were free to "make any arguments" without page limits following that hearing. *Id.* at 95. Fugedi's counsel suggested the deadline for such briefing. *See id.* It is thus preposterous for Fugedi to suggest that he was deprived of the opportunity to file a meaningful brief.

As noted earlier, my decision is based entirely on evidence that *Fugedi* put into the record. For example, I know that Mr. Hill represented Parker in a state court proceeding concerning the Property because *Mr. Hill* supplied the final judgment from the case in question. *See* Dkt. 16 at 9. It appears Fugedi's "gripe" is that I actually looked at the cases his counsel directed me to; for that, his counsel "have only themselves to blame." *Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 464 (5th Cir. 2020). "Facts learned by a judge in his or her judicial capacity regarding the parties before the court . . . cannot be the basis for

---

[18] In fact, Defendants pled "collusive assignment to create diversity in violation of 28 U.S.C. 1359" in their original answer on October 17, 2019. Dkt. 8 at 13. Defendants' original answer was superseded by the time the parties consented to me, so I had no reason to review it until my new law clerk—who decided to review the docket from start to finish in an attempt to understand the facts of the case—pointed it out to me.

disqualification." *United States v. Reagan*, 725 F.3d 471, 491 (5th Cir. 2013) (cleaned up). Because Fugedi points to no "extrajudicial knowledge" that I possess regarding this case, he "bears the burden of showing that [I] displayed a deep-seated favoritism or antagonism that would make fair judgment impossible." *Tejero*, 955 F.3d at 464 (cleaned up). He has not carried this burden.

For these reasons, Fugedi's Motions to Disqualify (Dkts. 256, 257) are **DENIED**.

## CONCLUSION

For the reasons discussed above, I find the creation of the Trust and Fugedi's appointment as Trustee were collusive devices to manufacture diversity jurisdiction where it would not otherwise exist in violation of § 1359. Accordingly, I **GRANT** Defendants' Motion to Dismiss (Dkt. 158) for lack of jurisdiction. I decline, however, to impose sanctions.

This matter is **DISMISSED WITHOUT PREJUDICE**. A final judgment will issue separately.

SIGNED this 17th day of April 2024.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE